DISCIPLINARY COUNSEL *v.* WILLARD.

[Cite as *Disciplinary Counsel v. Willard*, 123 Ohio St.3d 15, 2009-Ohio-3629.]

*Attorneys — Misconduct — Partnering with nonlawyer organization — Six*
*violations of the Disciplinary Rules — License suspension, partially*
*stayed.*

(No. 2009-0465 — Submitted June 16, 2009 — Decided July 30, 2009.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and
Discipline of the Supreme Court, No. 08-042.

_____

MOYER, C.J.

{¶ 1} Respondent, John Thaddeus Willard of Hamilton, Ohio, Attorney Registration No. 0002125, was admitted to the practice of law in Ohio in 1966. The Board of Commissioners on Grievances and Discipline recommends that we suspend respondent's license for one year, staying the suspension upon conditions, for his conduct in partnering with a nonlawyer organization to represent clients and for representing them with very little preparation or communication. We agree that respondent committed the misconduct found by the board and find two additional violations of the Disciplinary Rules. We also conclude that respondent's reproachable acts warrant a harsher punishment than that recommended by the board and accordingly suspend respondent for one year with six months stayed.

## I. Procedural History

{¶ 2} Relator, Disciplinary Counsel, filed a complaint against respondent, alleging violations of six Disciplinary Rules based on respondent's conduct in representing numerous clients referred to him by a foreclosure assistance service. A panel of the Board of Commissioners on Grievances and

Discipline heard the case and concluded that respondent had committed four violations of the Code of Professional Responsibility, but that there was a lack of clear and convincing evidence that respondent had committed the other two alleged violations. The panel recommended a suspension from the practice of law for one year, with the entire suspension stayed. The board adopted the panel's findings and sanction, recommending a stayed suspension of one year.

{¶ 3} Relator filed objections to the board's decision, arguing that there was sufficient evidence to support finding violations of the remaining two Disciplinary Rules and that respondent should be given a one-year suspension with only six months stayed.

## II. Misconduct

### A. Introduction

{¶ 4} Respondent was contacted by Foreclosure Alternatives in 2004 to represent customers in foreclosure actions. Foreclosure Alternatives is a company that solicits clients who are defendants in pending foreclosure proceedings by offering to intervene on their behalf and negotiate with the foreclosing lender. The company is not owned by attorneys, and to the parties' knowledge, it has no attorney employees.

{¶ 5} Foreclosure Alternatives sends direct-mail advertisements to these individuals. Any customers who respond are contacted by an employee to schedule a meeting, and a packet of information is sent to the customer. The packet includes a mediation agreement, which lays out the company's fees, and instructions for the customer to deposit money in an account on a monthly basis to demonstrate to the lender the customer's ability to make payments. A limited power of attorney is also included in the packet, which provides authority to an unnamed attorney to take legal action on the customer's behalf. None of the information provided discloses the fee that will be paid to the attorney out of the general fee paid to Foreclosure Alternatives. The information does state that the

company is "here to make this dreadful process go away," and the panel found that customers understood this phrase to mean that the company would resolve all foreclosure issues in their best interests.

*B. Respondent's Protocol for Cases from Foreclosure Alternatives*

**{¶ 6}** Respondent agreed to limited representation of customers referred by Foreclosure Alternatives for a fixed fee of $150 per case. His representation was limited to filing responsive pleadings, because the company retained authority to negotiate with the lender. Respondent participated in a minimum of 28 cases referred by Foreclosure Alternatives.

**{¶ 7}** Under respondent's usual protocol for these cases, he would receive a copy of the foreclosure complaint filed against the client and the limited power of attorney from Foreclosure Alternatives. He would then file an answer to the complaint or a motion to strike and send a copy to the client along with a letter stating: "This is a response I filed on your behalf. I had a referral from Foreclosure Alternatives. If there are any other defenses you can think of, feel free to call me." This letter was the first communication with the client, and, in fact, usually the first occasion for the client to learn the name of his attorney. Out of the 28 or more Foreclosure Alternatives clients, respondent discussed cases with only three or four of them.

**{¶ 8}** Negotiations with the lender were conducted by Foreclosure Alternatives; respondent was not even informed of their progress. The next action respondent would take was to notify the company when he received a motion for summary judgment filed by the lender. If the client had no defense, respondent sent a letter to the client stating: "A motion for summary judgment was filed. I suggest that you consider a Chapter 13 bankruptcy or a bankruptcy." Respondent did not otherwise personally communicate with the client.

*C. The Chandlers' Case*

{¶ 9}   The foreclosure on the home of David and Annette Chandler led to this professional grievance.  The Chandlers contacted the company after receiving an advertisement.   They then received the typical packet of information and subsequently submitted a copy of the complaint filed against them by their lender, Wells Fargo, the signed power of attorney, and the signed mediation agreement.

{¶ 10} After the Chandlers wrote a check for $450, half of the total fee, Foreclosure Alternatives notified them that the "attorney has filed plea [sic] and answered the complaint in your foreclosure case," although the letter did not identify the attorney, and no answer was ever filed.  The company did not actually refer the case to respondent for another two months.  By the time respondent received the file, in October 2006, the court had already entered a default judgment against the Chandlers and had ordered that their house be sold.  Instead of contacting the clients, however, respondent told the company that it was too late to help the Chandlers; he agreed, however, to do "something" and accepted the fee.   Respondent filed a motion to strike the complaint and eventually contacted Wells Fargo.  The lender's representative informed respondent that the sale of the Chandlers' home would go forward as scheduled on October 23.

{¶ 11} The Chandlers learned of the sale of their home through a newspaper notice only two weeks prior to the scheduled date.  Upon contacting Foreclosure Alternatives, the company informed them that everything was fine.  But on October 20, Foreclosure Alternatives told the Chandlers that their situation was hopeless.  The Chandlers were not notified that a motion to strike had been filed, and they never received a copy of the motion.  The foreclosure sale took place as scheduled on October 23.  It was only in early December that the Chandlers learned respondent's name by examining court documents.   The Chandlers wrote to respondent and requested that he forward their file to another attorney, who subsequently filed the grievance against respondent along with a civil suit against respondent and Foreclosure Alternatives.

### D. Disciplinary Rule Violations

**{¶ 12}** The board first found respondent to have violated DR 2-103(C) (In general, a lawyer shall not request a person or organization to recommend or promote the use of the lawyer's services). We agree with the board's finding. Respondent entered into an oral agreement with Foreclosure Alternatives whereby the company, which did not employ any attorneys, would solicit business from customers and refer the cases to respondent. The company does not qualify as an authorized referral service as described in DR 2-103(C)(1). Respondent had no contact with the clients prior to the referral, and he obtained the business only because of this agreement with the company. In fact, the clients did not even know the identity of their attorney before he began work on their cases.

**{¶ 13}** The board also found respondent to have violated DR 3-101(A) (A lawyer shall not aid a nonlawyer in the unauthorized practice of law). "We have held that by advising debtors of their legal rights and the terms and conditions of settlement in negotiations to avoid pending foreclosure proceedings, laypersons engage in the unauthorized practice of law." *Cincinnati Bar Assn. v. Mullaney*, 119 Ohio St.3d 412, 2008-Ohio-4541, 894 N.E.2d 1210, ¶ 20, citing *Cincinnati Bar Assn. v. Telford* (1999), 85 Ohio St.3d 111, 707 N.E.2d 462. Though respondent provided in-court legal representation by filing pleadings on behalf of the Chandlers and other clients, all negotiations with creditors were performed by Foreclosure Alternatives. This arrangement was part of the agreement between respondent and the company. It is not contested that Foreclosure Alternatives does not employ any attorneys.

**{¶ 14}** The board next found a violation of DR 3-102(A) (In general, a lawyer shall not share legal fees with a nonlawyer). The Chandlers and other customers paid a set fee to Foreclosure Alternatives to handle negotiations with foreclosing lenders and to provide advice regarding their situation. This work amounts to the practice of law. See *Mullaney*, 119 Ohio St.3d 412, 2008-Ohio-

4541, 894 N.E.2d 1210, at ¶ 20. The company then transferred $150 of the set fee paid by customers to respondent for each case he handled. Because Foreclosure Alternatives does not employ attorneys, by his participation in this arrangement, respondent shared legal fees with a nonlawyer.

{¶ 15} Finally, the board found a violation of DR 3-103(A) (A lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law). As we have explained, the actions of respondent and Foreclosure Alternatives constituted the practice of law by representing debtors facing foreclosure. Respondent partnered with the company to provide these legal services, with respondent filing formal pleadings on the clients' behalf and the company advising the clients and negotiating with lenders. Respondent has not filed objections to these findings, and we agree with the board that respondent violated these four Disciplinary Rules.

{¶ 16} But the board found a lack of clear and convincing evidence to support alleged violations of both DR 6-101(A)(2) and 7-101(A)(1), and relator has now objected to their dismissal. The objections are well taken.

{¶ 17} DR 6-101(A)(2) prohibits a lawyer from handling a legal matter without adequate preparation. The parties stipulated that respondent's conduct violated this rule, but the board concluded that even a more prepared attorney could not have done more for the Chandlers because default judgment had already been entered against them. The board assumed that the Chandlers' circumstances did not allow for any form of relief from the default judgment. But though a default judgment had been entered, respondent still accepted the case from Foreclosure Alternatives and filed a motion to strike without contacting his clients to learn about their situation and any possible defenses. An attorney cannot be adequately prepared to represent clients if he has never even bothered to contact them.

**{¶ 18}** The board's analysis of DR 6-101(A)(2) also ignored the other clients whom respondent represented on referral from Foreclosure Alternatives. The stipulated facts show that respondent typically filed an answer to a foreclosure complaint against clients without contacting them. His initial contact involved a copy of the answer and a cover letter that put the burden on the clients to put forth any additional legal defenses. Respondent discussed cases with only three or four actual clients, and he did not negotiate with the clients' lenders. When a motion for summary judgment was filed against his clients, he simply sent a letter to the client notifying them of that fact and suggesting that they file bankruptcy. These facts show a lack of preparedness in violation of the Disciplinary Rules for all Foreclosure Alternatives clients. We hold that respondent violated DR 6-101(A)(2), as the parties stipulated.

**{¶ 19}** DR 7-101(A)(1) prohibits a lawyer from intentionally failing to seek the lawful objectives of his client. The board's finding that this alleged violation is not supported by clear and convincing evidence is incorrect. With respect to the Chandlers, respondent failed to seek their objectives by not contacting them to discover whether there remained any means to aid them in avoiding the pending foreclosure. With respect to the other clients, respondent violated this rule by "surrendering [his] professional judgment to" the company. *Mullaney*, 119 Ohio St.3d 412, 2008-Ohio-4541, 894 N.E.2d 1210, at ¶ 23. In *Mullaney*, we noted that "[c]ounseling debtors in financial crisis as to their best course of legal action requires the attention of a qualified attorney." Id. at ¶ 24, citing *Columbus Bar Assn. v. Flanagan* (1997), 77 Ohio St.3d 381, 383, 674 N.E.2d 681. Here, however, respondent was involved in the cases only to the extent that he filed responsive pleadings in court. All advising and negotiation were left to Foreclosure Alternatives. Respondent "failed to evaluate [his] clients' situations and develop a strategy to meet their individualized needs." Id. at ¶ 27. We hold that respondent also violated DR 7-101(A)(1).

### III. Sanction

**{¶ 20}** The proper sanction for violations of the Disciplinary Rules is determined by consideration of "the duties violated, respondent's mental state, the injury caused, the existence of aggravating or mitigating circumstances, and applicable precedent." *Disciplinary Counsel v. Evans* (2000), 89 Ohio St.3d 497, 501, 733 N.E.2d 609. Each factor is addressed below.

#### A. Duties Violated and Injury Caused

**{¶ 21}** Respondent's representation of clients referred from Foreclosure Alternatives led to violations of six Disciplinary Rules. Respondent arranged for an organization to promote his services, partnered with a nonlawyer to aid the other in the unauthorized practice of law and share legal fees, assumed cases without adequate preparation, and failed to seek the objectives of his clients. He represented at least 28 clients with very little communication and little or no knowledge of each client's particular circumstances. He relegated the negotiation of his clients' legal matters to nonlawyers, possibly leading to foreclosures on his clients' homes. Respondent's misconduct may very well have resulted in clients' losing their homes.

#### B. Mental State

**{¶ 22}** Because there has been no evidence presented to the contrary, we presume that respondent's mental state was healthy during the relevant period. *Disciplinary Counsel v. McCord*, 121 Ohio St.3d 497, 2009-Ohio-1517, 905 N.E.2d 1182, ¶ 45.

#### C. Aggravating and Mitigating Circumstances

**{¶ 23}** A nonexhaustive list of the aggravating and mitigating circumstances that may be considered in disciplinary cases is found in Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). In mitigation, the board noted that respondent has no prior

disciplinary record, that he displayed a cooperative attitude during the disciplinary process, that he lacked a dishonest or selfish motive, and that three letters were submitted to the panel attesting to respondent's character and reputation. BCGD Proc.Reg. 10(B)(2)(a), (b), (d), and (e). On the aggravation side, the board acknowledged the vulnerability and resulting harm to the victims of respondent's misconduct. BCGD Proc.Reg. 10(B)(1)(h). The Chandlers were lay people who relied on an unnamed attorney to protect their interests in court as Foreclosure Alternatives negotiated with the lender. Although respondent did not accept the case until after default judgment had been entered against the Chandlers, he still neglected to contact his clients, even after filing a motion to strike on their behalf. The Chandlers learned of the pending foreclosure sale of their home of 18 years through a newspaper notice.

{¶ 24} The board found this aggravating factor alone to outweigh the mitigating factors, considering that many of the problems resulted from respondent's initial agreement with Foreclosure Alternatives. We also find two additional aggravating factors. First, respondent committed multiple offenses in his representation of each individual client. BCGD Proc.Reg. 10(B)(1)(d). Second, respondent engaged in a pattern of misconduct because he represented at least 28 clients referred from Foreclosure Alternatives over a two-and-a-half-year period when his typical protocol resulted in disciplinary violations. BCGD Proc.Reg. 10(B)(1)(c). We adopt the aggravating and mitigating circumstances as found by the panel and board, with the addition of the two aggravating circumstances.

### D. Applicable Precedent

{¶ 25} The primary precedent is *Cincinnati Bar Assn. v. Mullaney*, 119 Ohio St.3d 412, 2008-Ohio-4541, 894 N.E.2d 1210. In that case, three attorneys were disciplined for representing a total of approximately 2,000 clients in the manner under review here. Id. at ¶ 5-18, 43-45. The attorneys entered an

agreement with a company called Foreclosure Solutions, L.L.C., which similarly solicited customers that were defendants in foreclosure actions, offering to negotiate with the lender and provide an attorney to represent them in court. Id. at ¶ 8. The company then referred a case to an attorney and transferred a portion of the fee paid by the customer. Id.

{¶ 26} The attorneys would then send each client a brochure describing the foreclosure process and file boilerplate pleadings in response to the complaints filed against their clients. Id. at ¶ 15. Copies of those pleadings would also be sent to the clients. Id. The attorneys did not typically meet with the clients or otherwise attempt to determine the circumstances of each client's case for possible legal defenses. Id. at ¶ 17. Instead, one of their standard letters asked whether the client knew of any available defenses, similar to respondent's letters here. Id. When judgment was entered against a client, the attorneys would notify the client of the pending foreclosure sale and recommend contacting a bankruptcy lawyer. Id. at ¶ 15.

{¶ 27} The facts in *Mullaney* are strikingly similar to those in the instant case. Two of the attorneys in *Mullaney* were found to have violated the very six Disciplinary Rules that respondent violated. Id. at ¶ 19-27. We also took note of nearly the same aggravating and mitigating circumstances in *Mullaney*. Id. at ¶ 37-42. One attorney in *Mullaney* was given a public reprimand because we found him to be an inexperienced associate who devoted many hours to his clients, but was constrained by the standard policies in place at the firm for representing clients referred by Foreclosure Solutions. Id. at ¶ 40. An injunction was ordered against a second attorney, who was not admitted to practice in Ohio, prohibiting him from practicing pro hac vice in the state for two years. Id. at ¶ 42. The third attorney, an experienced practitioner most similar to respondent, was given a one-year suspension, all stayed on the condition of no further misconduct. Id. at ¶ 41.

**{¶ 28}** Despite the similarities to *Mullaney*, the current case is distinguishable in ways that warrant a harsher punishment for respondent. First, we adopted the recommendation of the board in *Mullaney* when neither party objected to it. Id. at ¶ 1, 4. The relator, here, did object to the board's recommended sanction, asking us to hold that respondent had violated DR 6-101(A)(2) and 7-101(A)(1), as we did above, and to order a one-year suspension with only six months stayed.

**{¶ 29}** Second, respondent's actions specifically relating to the Chandlers adds additional misconduct to the protocol followed with his other clients, which was nearly identical to that in *Mullaney*. Respondent testified that when he received the Chandlers' case file from Foreclosure Alternatives, he concluded that it was too late to help them because a default judgment had already been entered against them. The problem is that respondent took the case anyway, accepted the fee, and filed a boilerplate motion to strike without even contacting the Chandlers. Respondent in fact never contacted the Chandlers during the entire period he represented them. This total lack of communication is more egregious than the conduct we found objectionable in *Mullaney*.

**{¶ 30}** We have held that an actual suspension is warranted in somewhat similar cases involving attorneys who represented clients through arrangements with companies that employed nonlawyers and marketed living trusts to customers. *Disciplinary Counsel v. Wheatley*, 107 Ohio St.3d 224, 2005-Ohio-6266, 837 N.E.2d 1188, ¶ 3, 40; *Columbus Bar Assn. v. Fishman*, 98 Ohio St.3d 172, 2002-Ohio-7086, 781 N.E.2d 204, ¶ 1, 21; *Cincinnati Bar Assn. v. Kathman* (2001), 92 Ohio St.3d 92, 93, 98, 748 N.E.2d 1091. But see *Cincinnati Bar Assn. v. Heisler*, 113 Ohio St.3d 447, 2007-Ohio-2338, 866 N.E.2d 490, ¶ 18, 21 (ordering six-month stayed suspension of attorney that accepted referrals from a nonlawyer company that marketed estate planning services, where attorney personally interviewed clients and exercised independent judgment regarding

each client's circumstances). In each case, the attorney received referrals from the companies after nonlawyer employees collected information from the customer or completed the living-trust documentation, which was then forwarded to the attorney for final preparation or approval of the legal documents. *Wheatley* at ¶ 4-14; *Fishman* at ¶ 2-8; *Kathman* at 93-94. The attorney had little or no direct communication with clients. *Wheatley* at ¶ 5, 13-15; *Fishman* at ¶ 2-7; *Kathman* at 93-94. Respondent's conduct in the case before us similarly deserves an actual suspension.

### *E. Determination*

**{¶ 31}** Respondent's conduct in this case constituted violations of six Disciplinary Rules and warrants an actual suspension from the practice of law. We therefore decline to adopt the board's recommended sanction and instead order that respondent be suspended for a period of one year, with six months stayed on condition that he commit no further misconduct. If respondent fails to comply with this condition, the stay will be lifted, and respondent will serve the one-year suspension. Costs are taxed to respondent.

Judgment accordingly.

LUNDBERG STRATTON, O'CONNOR, and CUPP, JJ., concur.

PFEIFER, O'DONNELL, and LANZINGER, JJ., dissent and would suspend respondent from the practice of law in Ohio for one year, all stayed on conditions.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Carol A. Costa, Assistant Disciplinary Counsel, for relator.

Reminger Co., L.P.A., and Rick L. Weil, for respondent.

_____